**WILBURN, Appellee,**

v.

**WILBURN, Appellant; Holliday, Appellee.**

[Cite as *Wilburn v. Wilburn* (2001), 144 Ohio App.3d 279.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 18564.

Decided June 15, 2001.

*Rhonda S. Wilburn,* appellee.

*Christopher B. Epley* and *Robert L. Mues,* for appellant.

*Deborah C. Schram,* for appellee Patsy S. Holliday.

WOLFF, Presiding Judge.

Kenneth E. Wilburn appeals from a judgment of the Montgomery County Court of Common Pleas, Domestic Relations Division, which adopted a magis-

trate's decision over his objections and continued custody of his daughter with her maternal grandmother, Patsy S. Holliday.

The record reveals as follows. Kaitlyn Wilburn was born on April 8, 1992. Her parents, Kenneth and Rhonda S. Wilburn, were married three months after her birth. On March 17, 1993, the couple was divorced and Rhonda was awarded custody of Kaitlyn.

In early September 1996, Rhonda asked her mother, Holliday, to come to West Virginia where Rhonda was living and to pick up Kaitlyn and take her back to Ohio. Rhonda was apparently involved in an abusive relationship with another person and feared for her daughter's safety. On September 6, 1996, Holliday was awarded temporary custody of Kaitlyn. On February 5, 1997, Holliday was awarded "custody" of Kaitlyn "until further order of the court[.]" At the hearing which precipitated that decision, Kenneth and Holliday agreed that Rhonda should no longer have custody of Kaitlyn and that Kaitlyn's best interest would be served if she was in the custody of Holliday. At the time, Kenneth was apparently single and held a third-shift job.

On January 30, 1998, Kenneth filed a motion for a change of custody, requesting that he be awarded permanent custody of Kaitlyn. Rhonda filed a motion for a change of custody on August 4, 1998, requesting that she be awarded permanent custody of Kaitlyn. Holliday contested the motions. A custody hearing was held before a magistrate on November 17–18, 1998, February 23–24, 1999, June 17, 1999, and August 16–17, 1999. Kenneth, Rhonda, and Holliday participated in the hearing. On March 3, 2000, the magistrate issued her decision awarding custody to Holliday. Kenneth filed objections to the magistrate's decision. On October 4, 2000, the trial court overruled Kenneth's objections and adopted the magistrate's decision.

Kenneth now appeals the trial court's decision. He asserts two assignments of error:

"I. The trial court committed plain and reversible error when it deprived appellant, a fit parent, of the care, custody, and control of his minor child in favor of a nonrelative based solely on the best interest test."

■ Kenneth argues that the trial court erred when it used the best-interest standard to determine that Holliday should be awarded custody of Kaitlyn. He asserts that the trial court should have used the unsuitability standard to make its determination because that standard is applicable in a custody dispute between a parent and a nonparent. Kenneth relies on three cases to support his argument: *Troxel v. Granville* (2000), 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49; *In re Perales* (1977), 52 Ohio St.2d 89, 6 O.O.3d 293, 369 N.E.2d 1047; and

*Esch v. Esch* (Feb. 23, 2001), Montgomery App. No. 18489, unreported, 2001 WL 173198.

In *Troxel*, the United States Supreme Court addressed a case where the paternal grandparents of two children desired more visitation with the children than the children's mother would allow them to have. In that case, the Supreme Court reiterated that parents have a fundamental right to make decisions regarding the care, custody, and control of their children. *Troxel*, 530 U.S. at 65–66, 120 S.Ct. at 2060, 147 L.Ed.2d at 55–57.

In *Perales*, the Supreme Court of Ohio reviewed a mother's appeal of a trial court's judgment granting custody of her daughter to a nonparent of the child. The Supreme Court reversed the trial court's judgment after finding that the trial court had used the best-interest standard. The Supreme Court held that in a "child custody proceeding between a parent and a nonparent, the [court] may not award custody to the nonparent without first making a finding of parental unsuitability." *Perales* at syllabus.

In *Esch*, our court addressed a father's appeal of a trial court's award of "full custody" of his daughter to her maternal grandmother. We reversed the trial court's judgment after finding that the trial court had erred in utilizing the best-interest standard when making its award. We remanded the case and, pursuant to *Perales*, we instructed the trial court to utilize the unsuitability standard and to award custody of the daughter to her grandmother only if it found her parents to be unsuitable. *Esch, supra.*

None of those cases is directly applicable to the facts in this case. *Troxel* concerned grandparent visitation with grandchildren, not grandparent custody of a grandchild as we have in this case. *Perales* and *Esch* concerned appeals of original determinations of custody in favor of a nonparent and against a parent. In our case, the original determination of Kaitlyn's custody was made by the trial court in 1997, at which time both Kenneth and Holliday agreed that Holliday should be awarded custody of Kaitlyn. The trial court decision that is now before us concerns Kenneth's motion for a change of custody.

In 1986, the Supreme Court reviewed a case similar to this case. See *Masitto v. Masitto* (1986), 22 Ohio St.3d 63, 22 OBR 81, 488 N.E.2d 857. In *Masitto*, the Supreme Court addressed the issue of whether it was contrary to law for a trial court to use the best-interest standard enunciated in R.C. 3109.04 when the parent requesting a change in custody had previously consented to the appointment of the child's grandparents as her guardians. *Masitto*, 22 Ohio St.3d at 65, 22 OBR at 82, 488 N.E.2d at 859. Quoting *Perales*, the court stated that the "general rule in Ohio regarding original custody awards in disputes between a parent and a non-parent is that 'parents who are "suitable" persons have a "paramount" right to the custody of their minor children unless they forfeit that

right by contract, abandonment, or by becoming totally unable to care for and support those children.'" *Id.* at 65, 22 OBR at 82, 488 N.E.2d at 859–860. The court said, however, that "[o]nce an original custody award has been made, the general rule is that such award will not be modified unless 'necessary to serve the best interest of the child.'" *Id.* at 65, 22 OBR at 82, 488 N.E.2d at 860.

As we stated above, and as the trial court found below, the original determination of Kaitlyn's custody was made in this case in 1997 when Holliday was awarded custody of Kaitlyn. Thus, the trial court did not err when it used the best-interest standard to make its ruling on Kenneth's motion for a change of custody.

In his reply brief, Kenneth argues that, as far as he had understood, the original custody determination had not been made in 1997 but instead that Holliday had been granted only temporary custody of Kaitlyn at that time.

 "Parents may undoubtedly waive their right to custody of their children and are bound by an agreement to do so." *Id.* "Whether or not a parent relinquishes rights to custody is a question of fact which, once determined, will be upheld on appeal if there is some reliable, credible evidence to support the finding." *Id.* at 66, 22 OBR at 83, 488 N.E.2d at 860.

 Both the magistrate and trial court in this case determined that Kenneth had relinquished his right to custody of Kaitlyn in 1997. The following evidence in the record supports that finding. In its February 5, 1997 decision, the trial court ordered that "[c]ustody of Kaitlyn * * * [be] granted to [Holliday], forthwith, until further order of the court." In its findings of fact and conclusions of law, the court stated that, during the motion hearing, Kenneth had "consent[ed] to permanent custody of Kaitlyn being granted to * * * [Holliday] until further order of the court." The transcript of that motion hearing reveals that Holliday's attorney announced, in the presence of Kenneth and his attorney, that the parties had reached a stipulation and that Kenneth had "consent[ed] to * * * Holliday having custody of the child." Kenneth's attorney thereafter indicated to the court that his client was "in full accord with the stipulation." The February 5, 1997 order was titled "MAGISTRATE DECISION AND PERMANENT ORDER." Although it was the magistrate's decision, it was signed by the trial court, and Kenneth did not file objections to it. We also note that the magistrate who ruled on Kenneth's motion for a change in custody was the same magistrate who had held the motion hearing in 1997 that had resulted in Holliday's being awarded custody of Kaitlyn.

In its decision denying Kenneth's motion for a change of custody, the trial court concluded that Kenneth's testimony at the change of custody hearing did "not indicate a lack of understanding of the award of legal custody [to Holliday],

so much as it indicate[d] his belief that a change in his work schedule would constitute grounds for a change of custody." We agree. Kenneth's testimony at the change of custody hearing indicated that he had believed that, although the court had been awarding custody of Kaitlyn to Holliday at that time, he would be able to obtain a change in custody in the future, if he so desired, when he stopped working third shift and began working first shift. Although Kenneth might have believed that he could obtain a change of custody under such circumstances, that belief does not lead us to conclude that he thought the 1997 award of custody to Holliday was temporary. Because there is some reliable, credible evidence to support the trial court's finding, we will not conclude that the trial court erred in determining that Kenneth had relinquished his right to custody of Kaitlyn in 1997. Accordingly, it did not err in applying the best-interest standard to Kenneth's motion for change of custody.

The first assignment of error is overruled.

"II. The decision of the trial court and its findings of fact were against the manifest weight of evidence."

Kenneth argues that, in 1997, he did not knowingly and voluntarily agree to allow Holliday to have permanent custody of Kaitlyn. He also argues that the evidence presented at the change of custody hearing demonstrated a change of circumstances and showed that Kaitlyn's best interest would be served if she were in his custody.

Kenneth argues that his case is similar to *In re Adoption of Jimenez* (1999), 136 Ohio App.3d 223, 736 N.E.2d 477. In *Jimenez,* we concluded that a mother's consent to an adoption was invalid because the adoptive parents' attorney had given the mother inaccurate and misleading information about the adoption process and because the magistrate had failed to question the mother as required by statute. Kenneth argues that, like the mother in *Jimenez,* he did not knowingly consent to Holliday receiving permanent custody of Kaitlyn. Unlike *Jimenez,* however, the record in this case does not reveal that Holliday's attorney gave Kenneth inaccurate or misleading information or that any statutory requirements were not met. In fact, Kenneth had his own attorney at the 1997 hearing and that attorney represented to the court that Kenneth was in full accord with the stipulation that Holliday have custody of Kaitlyn. Further, the mother in *Jimenez* filed a motion to withdraw her consent shortly after giving it and immediately appealed when her motion was overruled. In this case, Kenneth did not appeal the 1997 judgment that explicitly stated that he had consented to giving Holliday "permanent custody" of Kaitlyn and he did not file a motion for a change of custody until nearly a year after the 1997 decision had been rendered. Kenneth's case is also distinguishable from *Jimenez* because his case involves the

issue of custody, not adoption. Although those two issues may evoke similar emotions in natural parents, they do not have the same legal consequences.

Kenneth also argues that the evidence presented at the change of custody hearing demonstrated a change of circumstances and showed that Kaitlyn's best interest would be served if she were in his custody.

 A trial court generally has broad discretion in custody proceedings. *Davis v. Flickinger* (1997), 77 Ohio St.3d 415, 416–418, 674 N.E.2d 1159, 1161–1162. Thus, a trial court's judgment will not be reversed on appeal absent an abuse of discretion. *Id.* at paragraph one of the syllabus. An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142.

The statute governing a change of custody in this case states:

"The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, [or her] residential parent * * * and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree * * * unless a modification is in the best interest of the child and one of the following applies:

"* * *

"(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child." R.C. 3109.04(E)(1)(a).

Thus, a trial court can modify parental rights and responsibilities if it finds that there has been a change of circumstances, that the modification is in the best interest of the child, and that any harm likely to result from a change of environment is outweighed by the advantages of the change.

 In considering a motion for a change of custody, the trial court must first determine whether there has been a change of circumstances of the child or the residential parent since the prior court order. *Wyss v. Wyss* (1982), 3 Ohio App.3d 412, 414, 3 OBR 479, 481–482, 445 N.E.2d 1153, 1155. A change of circumstances must be found before the trial court weighs the child's best interest. *Zinnecker v. Zinnecker* (1999), 133 Ohio App.3d 378, 383, 728 N.E.2d 38, 41–42. "The purpose of requiring a finding of a change in circumstances is to prevent a constant relitigation of issues that have already been determined by the trial court." *Id.* at 383, 728 N.E.2d at 42, citing *Clyborn v. Clyborn* (1994), 93 Ohio App.3d 192, 196, 638 N.E.2d 112, 115.

■ Kenneth argues that he demonstrated a change of circumstances because he showed that Holliday had made repeated unsubstantiated allegations of sexual abuse against him.

One court has said that "unsubstantiated allegations of sexual abuse are a change of circumstances and may be grounds on which to modify a prior custody award." *Beekman v. Beekman* (1994), 96 Ohio App.3d 783, 789, 645 N.E.2d 1332, 1336; see, also, *Barton v. Barton* (Feb. 20, 1990), Madison App. No. CA89–08–013, unreported, 1990 WL 14797. But, see, *Stover v. Plumley* (1996), 113 Ohio App.3d 839, 842–843, 682 N.E.2d 683, 685–686 (case from the same appellate district as *Beekman*, noting that the two concurring judges in *Beekman* did not agree with the authoring judge's statement that unsubstantiated allegations of sexual abuse, standing alone, would warrant a modification of custody and holding, instead, that "unsubstantiated allegations of sexual abuse are only one factor that a court may consider when determining whether a change in circumstances has occurred"). Both *Beekman* and *Barton* involved mothers who had made unsubstantiated allegations of sexual abuse against the children's fathers in an attempt to prevent them from exercising their court-ordered visitations with the children. *Beekman*, 96 Ohio App.3d at 789, 645 N.E.2d at 1336; *Barton, supra.*

The record shows that Holliday made an allegation that sexual abuse had occurred while Kaitlyn was in Kenneth's care. The allegation was apparently not directed solely at Kenneth, however, as Holliday's attorney questioned Kenneth at the change of custody hearing about the amount of time his stepson had been alone with Kaitlyn. Holliday took Kaitlyn to have her examined, but the pediatrician found no evidence of abuse.

Although the allegation was unsubstantiated, the record reveals that Holliday's suspicions were not unfounded. Holliday and Rhonda each testified to various sexual comments Kaitlyn had made, sexual acts they had witnessed Kaitlyn doing with her dolls and with other children, and stories Kaitlyn had told about things her stepbrother and father had done to her, had said to her, or had taught her. We are not surprised that such evidence, if true, would have led Holliday to investigate the possibility that Kaitlyn had been sexually abused, because a young child would not commonly have knowledge of such things. Thus, we do not believe that the trial court abused its discretion when it concluded that Holliday's allegation did not constitute a change of circumstances.

■ Kenneth also argues that he demonstrated a change of circumstances because he showed that Holliday had interfered with his right to visitation with Kaitlyn.

As we have previously stated, "It is well settled that a custodial parent's interference with visitation by a noncustodial parent may be considered a 'change

of circumstances' which would allow for a modification of custody." (Emphasis deleted.) *Mitchell v. Mitchell* (1998), 126 Ohio App.3d 500, 505, 710 N.E.2d 793, 796, citing *Galluzzo v. Galluzzo* (Apr. 26, 1996), Champaign App. No. 95–CA–15, unreported, 1996 WL 200598, appeal dismissed (1996), 77 Ohio St.3d 1444, 671 N.E.2d 1283.

During the change of custody hearing, Kenneth alleged that Holliday had interfered with his visitation with Kaitlyn approximately five times over the course of a year. The record reveals some confusion among the parties as to which visitation schedule or order was being used in their case. Thus, it is unclear whether Kenneth was actually entitled to some of the visitations in question. Further, Holliday testified that she had not interfered with Kenneth's visitations on some of the alleged dates, but instead that Kenneth had failed to pick Kaitlyn up at the scheduled time. She also stated that Kenneth had canceled his visitations on some occasions. She admitted that she had interfered with one of Kenneth's visitations when she and Kaitlyn were out-of-state visiting a seriously ill family member. Based upon the evidence presented, we cannot conclude that the trial court abused its discretion in concluding that Holliday's alleged interference with Kenneth's visitation did not constitute a change of circumstances.

Kenneth also argues that he demonstrated a change of circumstances when he proved that Kaitlyn had performed poorly in school and had experienced behavioral problems while living with Holliday.

The record reveals that Kaitlyn was not old enough to be in school when she started living with Holliday. Further, while Kaitlyn has struggled in some of her school subjects, the record showed that Kaitlyn's overall performance gradually improved. Holliday testified that she routinely helped Kaitlyn with her spelling and math skills and that she had hired a tutor for Kaitlyn. Although Kenneth testified that he had behavioral problems with Kaitlyn while she was in his care, Holliday and Rhonda each testified that Kaitlyn was not ill-behaved when she was with them. Thus, the trial court did not err in concluding that her school performance and behavior failed to demonstrate a change of circumstances.

Because the trial court did not err in finding no change of circumstances, it did not need to consider Kaitlyn's best interests before overruling Kenneth's motion for a change of custody. The second assignment of error is overruled.

The judgment of the trial court will be affirmed.

*Judgment affirmed.*

BROGAN and FAIN, JJ., concur.